```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
THEODORE BROWN,

                Petitioner,           MEMORANDUM & ORDER
                                      05-CV-3631(JS)
        -against-

JOHN PURGE,

                Respondent.
----------------------------------X
APPEARANCES:
Petitioner:     Theodore Brown, Pro Se
                98A5376
                Shawangunk Correctional Facility
                P.O. Box 700
                Wallkill, NY 12589

For Respondent: Michael Herman Blakey, Esq.
                Thomas J. Spota, Esq.
                Criminal Court Building
                200 Center Drive
                Riverhead, NY 11901
```

SEYBERT, District Judge:

Petitioner, Theodore Brown ("Brown" or "Petitioner"), petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons below, the Petition is DENIED.

BACKGROUND

I. Factual Background: Commission of the Crime and Investigation

This case involved Petitioner and Anthony McGhee, his co-defendant, committing several armed robberies in Wyandanch. On May 28, 1998, during one attempted robbery on a public street in Wyandanch, Petitioner fired a shotgun into a woman's head. A few days later, on June 3, 1998, Police arrested McGhee. Petitioner was arrested on June 4, 1998. Detectives testified that Petitioner

did not speak on the way to the precinct and never asked for a lawyer. (H1. 21-26.)

Petitioner was taken into custody at about 7:45 p.m. They drove to Yaphank in about twenty minutes. Petitioner was placed in the interview room and handcuffed to the desk. He was told that his custody related to a homicide investigation and advised of his constitutional rights. Petitioner initialed next to the waiver questions on the Miranda card. He said no to the question about contacting a lawyer and was willing to speak to the police. Detectives completed the advice of rights at about 8:20 p.m., and testified that they made no threats or promises. (H1. 43-52).

Detectives asked Petitioner about the death of a woman, Keisha Greenridge ("Victim"), in Wyandanch in May 1998. He denied any involvement, admitted having been to Harrison Avenue in Amityville, New York, but denied spending time in Wyandanch. In response, the detectives told him that he had been seen in Wyandanch in May, and that they had information that Petitioner was involved in the shooting of Keisha Greenridge. Brown said he did not shoot anyone. After additional questioning, Petitioner admitted knowing "Shanky"--Anthony McGhee--for about eight months. When confronted, Brown said he could not explain why McGhee said they knew each other for two years while he had thought it was only eight months. Then Petitioner asked for time to pray (H1. 63-65).

2

When questioning resumed, Petitioner was asked if he owned a shotgun. He said no. He admitted, however, to seeing a shotgun, but he would not say to whom it belonged. Detectives next told Petitioner that his garage would be searched, and he still denied owning a shotgun. In fact, Petitioner insisted if the police found a shotgun in his garage, it would not belong to him.

At about 1:30 a.m., Petitioner was brought to the First Precinct. Four people were ready to view the lineups in the basement. Lawrence Johnson ("Johnson") and Dillon John ("John") had been robbed shortly before and not very far away from where the Victim was killed. Arthur Greenridge ("Greenridge") and Cedric Hardeman ("Hardeman") were with the victim when she was shot. Everyone in the lineup was African-American, about the same age, and wore jumpsuits. Each lineup was photographed twice, so there were four photographs. Hardeman viewed first. He picked someone other than Petitioner. Petitioner held placard number five, but Hardeman picked the man holding placard number two. Johnson selected Petitioner. At 2:45 a.m., Greenridge also selected Petitioner. Last to view, John also selected Petitioner. The lineup participants were then shuffled and each witness took a second look. Now Petitioner chose to hold placard number six. Johnson looked first and again picked Petitioner. Greenridge went next and also picked Petitioner. Hardeman selected the man holding placard number four, who was not Petitioner. John picked

Petitioner again. All of the witnesses were kept separated throughout this process. Three written statements were taken from the witnesses who selected Petitioner. After the lineup, when Petitioner again rejoined the Detectives, he asked if they had picked him out and he was told they had. Petitioner said, "I figured that." (H1. 68-86.)

On the ride back to Yaphank, Petitioner told the detectives they were good and asked how they figured it all out. The detectives explained they had talked to many people, but they still wanted to hear his side of the story. Petitioner said he felt bad for three days. When asked, "What happened?" Petitioner said it was an accident. He was with "Shanky" when they stole the car from apartments on Harrison Avenue in Amityville. Then they both went to Wyandanch to rob some drug dealers and get some crack. He said they robbed two men up the street from the shooting, but did not get any drugs. When he and Shanky saw the Victim, they decided to attempt another robbery. Petitioner admitted he was the driver. When he went to get out of the car--it was still moving at the time--the shotgun got caught on the seatbelt and just went off. He agreed to give a written statement when they got back to Yaphank. Thirty seconds later, Petitioner said, "I never thought I would feel good about telling on myself." They got back to Yaphank around 3:45 a.m. (H1. 87-90.)

While Petitioner was in custody, he used the bathroom

4

several times and was given water, coffee, and cigarettes. After detectives re-advised Petitioner of his rights, and he waived them, Petitioner began the written confession, at approximately 4:00 a.m. Petitioner initialed corrected errors twice on the second page and once on the third page. He also identified a photograph of Anthony McGhee as "Shanky." (H1. 91-104, H2. 2-24.) At 5:20 a.m., the confession was completed, and Petitioner swore to the truth of its contents. The detectives next wanted Petitioner to draw a sketch of the crime scene and look at photographs, but they were informed by Sergeant Fandrey that Phil Murphy had called to stop the interrogation. At 5:45 a.m., Petitioner then signed a video refusal form (H2. 5-12). Based on the evidence, including Petitioner's confession, McGhee eventually chose to plead guilty. Petitioner went to trial.

II. Procedural History

Petitioner's trial took place in January and February 2001. During the trial in the County Court of Suffolk County, New York, Petitioner raised two arguments that are relevant for purposes of his current Petition: (1) he disputed the voluntariness of his confession; and (2) he opposed the court's modification of its prior Sandoval ruling.

At a hearing held on July 31, August 3, and September 11, 2000, defense counsel claimed Petitioner was not advised of his constitutional rights and was coerced to sign a written statement

he did not read or understand. He also argued that the lineup was too suggestive. (H1. 2-10.)[1] After hearing testimony by multiple witnesses that Petitioner was advised of his rights on several occasions, on October 5, 2000, Judge Mullin issued a decision holding (1) that Petitioner's oral and written statements were voluntary beyond a reasonable doubt; (2) that there were no violations of Petitioner's constitutional rights; and (3) the lineup identifications were proper. The motion to suppress was denied.

Later in the trial, the court conducted a <u>Sandoval</u> hearing. As a result of the hearing, Judge Mullin limited the prosecution to asking if Petitioner had been convicted of a felony or a misdemeanor on certain prior dates; however, Petitioner's history of gun crimes, including one felony in which he pleaded guilty to reckless endangerment after firing a .357 magnum into a group of people, could not be delved into. Subsequently, however, Petitioner chose to testify about his experience with guns and stated that he had never fired a gun in the past. (T. 2392-2407, 2412-2418.) When asked about how he had obtained the shotgun found in his garage, he stated that he had traded a handgun to get the shotgun, and stated that he owned a shotgun to protect his dogs from raccoons. (T. 2371-2377.) Based on this testimony,

---

[1] "H1" refers to the minutes of July 31, 2000 hearing. "H2" refers to the August 3, 2000 hearing. "H3" refers to the September 11, 2000 hearing. "T" refers to the trial minutes.

6

Respondent moved to alter the court's prior Sandoval ruling to allow the fact that Petitioner's prior crimes involved a gun. Respondent maintained that, since felons cannot own a shotgun, Petitioner had opened the door to inquiries about his previous ownership and use of handguns. (Id.) In response, defense counsel argued that Petitioner's testimony had not misled the jury. Counsel conceded that questions about the illegality of possessing the shotgun and the prior possession of the handgun would be fair, but revealing prior crimes and confessions would be too prejudicial. (T. 2419-2430.)

After hearing argument on both sides, the court ruled that (1) the original Sandoval ruling did not preclude inquiry into Petitioner's possession of the handgun that he traded for the shotgun, because Petitioner gave testimony about both on direct. The court also held that the Sandoval ruling would be modified to allow inquiry into the fact that Petitioner's previous conviction involved the use of a gun. Finally, the court declined to allow any questioning about prior occasions where Petitioner agreed to speak to police without an attorney present. (Resp.'s Ans. ¶¶ 96-97 (citing T. 2431-2435).)

On cross-examination, Petitioner admitted to numerous convictions: (1) On October 26, 1992, he was convicted of two felonies, both for incidents where he was using a handgun at the age of sixteen; (2) On June 16, 1995, he was convicted of a

7

misdemeanor for the use of a handgun; (3) On April 23, 1998, he was convicted for his third felony and for his second misdemeanor, both for use of a handgun.

On March 19, 2001, Petitioner was convicted of Murder in the Second Degree, Robbery in the First Degree, Assault in the Second Degree, Attempted Robbery in the First Degree, and two counts of Criminal Possession of Stolen Property in the Fourth Degree. He was sentenced to an indeterminate term of imprisonment of fifty-four years to life. Subsequently, Petitioner appealed his conviction to the Appellate Division, Second Department. (Resp.'s Ans. ¶¶ 124-25.)

In Petitioner's Appellate Brief, his counsel presented seven claims of error: (1) improper modification of the Sandoval ruling and subsequent cross-examination; (2) improper rebuttal testimony; (3) coerced confession; (4) improper prosecution summation; (5) inflammatory use of autopsy photographs; (6) verdict against the weight of the evidence and guilt not proven beyond a reasonable doubt; and (7) excessive sentence. (Id. ¶ 124.) On October 4, 2004, the Appellate Division affirmed Petitioner's conviction. New York v. Brown, 782 N.Y.S.2d 780 (App. Div. 2004). The court found that the "People established the voluntariness of the defendant's confession beyond a reasonable doubt" and that the "verdict of guilt was not against the weight of the evidence." Id. at 780 (citations omitted). The Appellate Division also held that

Petitioner's misleading testimony on direct-examination opened the door to the modified <u>Sandoval</u> ruling. <u>Id.</u>

Petitioner filed an application to appeal with the New York State Court of Appeals on October 21, 2004. (Resp.'s Ans. ¶ 126.) Leave to appeal was denied on November 29, 2004. <u>New York v. Brown</u>, 3 N.Y.3d 755, 821 N.E.2d 976, 788 N.Y.S.2d 671 (2004). No petition for certiorari was filed with the United States Supreme Court. (Resp.'s Ans. ¶ 126.)

On July 29, 2005, Petitioner filed his Petition with this Court. He raises three main arguments: (1) the trial court's denial of Petitioner's motion to suppress his alleged forced confession and the police's denial of counsel during interrogation violated his Fourteenth Amendment rights; (2) Petitioner's appellate counsel did not represent him effectively in his direct appeal and his trial counsel improperly failed to seek reopening of the suppression hearing; and (3) the permitted modification of <u>Sandoval</u> ruling violated his Fourteenth Amendment due process rights. The Court addresses each of these arguments below.

DISCUSSION

I. <u>Federal Habeas Review of State Convictions</u>

Petitioner filed this action after the April 24, 1996, effective date of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Accordingly, the AEDPA's provisions apply to his case. <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 402, 120 S. Ct.

1479, 1518, 146 L. Ed. 2d 389 (2000). Section 2254 provides that a habeas corpus application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This deferential review is applied as long as the "federal claim has been 'adjudicated on the merits' by the state court." Cotto v. Herbert, 331 F.3d 217, 231 (2d Cir. 2003). "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks omitted).

"Clearly established federal law 'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002) (internal quotation marks and alterations omitted)). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a Supreme Court case, or it "confronts a set of facts that are materially distinguishable from a decision of [the Supreme

10

Court] and nevertheless arrives at a result different from [its] precedent." Penry v. Johnson, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001). A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case[.]" Williams v. Taylor, 529 U.S. 362, 407-08, 120 S. Ct. 1495, 1520, 146 L. Ed. 2d 389 (2000). Accordingly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

II. Petitioner's Confession was Voluntary

Petitioner asserts that his allegedly false confession was the result of physical coercion and a denial of counsel during his interrogation. Courts evaluate whether a confession was the result of coercion by examining the "totality of all the surrounding circumstances[.]" United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991). Certain factors are used to determine if a confession is voluntary including the "characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive

11

tactics." Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997). "When reviewing a habeas petition, '[t]he factual findings of the New York Courts are presumed to be correct[,]'" with regard to "'recitals of external events and the credibility of the witnesses narrating them.'" Id. (quoting Green v. Scully, 850 F.2d 894, 900 (2d Cir. 1988) (alteration in original)). Thus, the state court's determination of whether "'the police engaged in the intimidation tactics alleged by the defendant [is] entitled to the presumption of correctness." Nelson, 121 F.3d at 833-34 (quoting Miller v. Fenton, 474 U.S. 104, 112, 106 S. Ct. 445, 450, 88 L. Ed. 2d 405 (1985)). Section 2254(d) of the United States Code provides that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence . . . ."[2] 28 U.S.C. § 2254(d).

In this case, Petitioner fails to provide the Court with any evidence that would call into question the validity of the factual findings of the state court. Respondent developed the material facts and provided an eyewitness corroborating Respondent's factual and legal assertions. (Resp.'s Ans. ¶¶ 33-34.) Petitioner was twice advised of his Miranda rights, once before the initial interrogation and once before his written

---

[2] With respect to the presumption of correctness attached to a state court's factual findings, in 1996 Congress eliminated the list of circumstances under which the presumption would be rebutted, and simply laid out the clear and convincing standard currently in the statute.

12

confession. (Id. ¶ 61; Resp.'s Mem. of Law 1-2.) He was at the police station for several hours before providing a written confession, which he read and understood. (Resp.'s Ans. ¶ 71; see also United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996) (finding that since the defendant "made his statements more than two hours after his arrest suggests that he had time to reflect upon his situation and that he freely chose to waive his rights[.]"). There were no claims that Petitioner was intoxicated or injured at the time of the confession to demonstrate his inability to provide a valid confession. (Resp.'s Mem. of Law 1-2.)

In addition, Petitioner fails to provide any evidence to support his claims that he was denied counsel at the time of the interrogation or confession. Respondent states that Petitioner did not ask for a lawyer when arrested or during the first hour of the interview. (Resp.'s Ans. ¶¶ 6, 11.) Petitioner waived his Miranda rights and "said no to the question about contacting a lawyer[.]" (Id. ¶ 8.) Thus, Petitioner's claim that his confession was forced does not entitle him to habeas relief.

### III. Petitioner has Failed to Establish that he Received Ineffective Assistance of Appellate Counsel

The Second Circuit Court of Appeals has adopted the test for ineffective assistance of trial counsel for claims of ineffective assistance of appellate counsel. See Bunkley v. Meachum, 68 F.3d 1518, 1521 (2d Cir. 1995); Mabee v. Phillips, No. 05-CV-4182, 2009 WL 3644077, at *5 (S.D.N.Y. Nov. 4, 2009). To

13

prevail on a claim of ineffective assistance of counsel, Petitioner "must show both that his counsel acted 'outside the wide range of professionally competent assistance,' and that the deficiencies in his counsel's performance were prejudicial to his defense." Jameson v. Coughlin, 22 F.3d 427, 429 (2d Cir. 1994) (quoting Strickland v. Washington, 466 U.S. 668, 690, 691-92, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Under the first Strickland prong, a court must evaluate whether an attorney's representation has fallen "below an objective standard of reasonableness," Strickland, 466 U.S. at 688, "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "Counsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." Id. at 691 ("[A] heavy measure of deference [is accorded] to counsel's judgments.")

It is well established that counsel need not raise every non-frivolous issue simply because a client suggests it "if counsel, as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1982); see also Abdurrahman v. Henderson, 897 F.2d 71, 74 (2d Cir. 1990). But "appellate counsel's performance may be found constitutionally inadequate upon demonstration that significant and obvious issues were ignored while weaker arguments were pursued." Mayo v. Henderson, 13 F.3d

14

528, 533 (2d Cir. 1994).

The second <u>Strickland</u> prong requires that any deficiencies in counsel's performance be prejudicial to the defense. <u>See</u> <u>id</u> at 691-92. While a finding of prejudice is not dependent upon a showing "that counsel's deficient conduct more likely than not altered the outcome in the case[,]" <u>Strickland</u>, 466 U.S. at 693, the petitioner nevertheless must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Bunkley v. Meachum</u>, 68 F.3d 1518, 1521 (2d Cir. 1995).

Even assuming that Petitioner has exhausted his claim, which it appears he has not, on the merits he fails to demonstrate that either his trial or appellate counsel provided him with ineffective representation. Petitioner simply asserts that his trial counsel failed to move to reopen the suppression hearing and his appellate counsel failed to raise ineffective assistance of trial counsel on appeal. But, Petitioner cannot demonstrate that either of his counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." <u>Clark</u>, 214 F.3d at 322 ("[C]ounsel does not have a duty to advance every nonfrivolous argument that could be made.") A petitioner cannot establish that he received ineffective assistance simply by

15

maintaining that his counsel failed to raise certain issues since "appellate lawyers have latitude in deciding which points to advance and how to order them." New York v. Stultz, 2 N.Y.3d 277, 285, 810 N.E.2d 883, 778 N.Y.S.2d 431 (2004). Moreover, as Respondent points out, a "defendant is not denied effective assistance of [counsel] . . . merely because counsel does not make a motion or argument that has little or no chance of success." Stultz, 2 N.Y.3d at 287. There is significant evidence that the courses of action Petitioner proposed for trial and appellate counsel would have failed. Beyond this failure, Petitioner cannot establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [either] proceeding would have been different." Strickland, 466 U.S. at 694. Therefore, Petitioner is not entitled to habeas relief on this ground.

IV. The Modification of the Sandoval Hearing was Appropriate

A Sandoval hearing is based on the New York State Court of Appeals' decision in New York v. Sandoval, 34 N.Y.2d 371, 314 N.E.2d 413, 357 N.Y.S.2d 849 (1974). In that case, the New York Court of Appeals held that a trial judge may determine the scope of the prosecution's use of the defendant's prior convictions or proof of the prior commission by the defendant of any specific criminal, vicious or immoral acts to impeach the defendant's credibility, should he take the stand. Id. at 374. As a general rule, the

state may not raise evidence precluded by the <u>Sandoval</u> ruling. However, when a defendant testifies to facts that are in conflict with evidence precluded by a <u>Sandoval</u> ruling, he "opens the door" on the issue in question, and "is properly subject to impeachment by the prosecution's use of the otherwise precluded evidence." <u>New York v. Rodriguez</u>, 85 N.Y.2d 586, 591 650 N.E.2d 1293, 627 N.Y.S.2d 292 (1995).

In this case, Petitioner offered testimony that was at odds with the facts underlying his prior conviction. Specifically, he testified about trading a handgun to get the shotgun and tried to offer an innocent reason for his illegal possession of the shotgun. This testimony misled the jury about how Petitioner gained his familiarity with guns. Based on this testimony, it would be appropriate to permit the admission of evidence solely to impeach the witness. <u>Sandoval</u>, 34 N.Y.2d at 376. Thus, the court appropriately allowed the evidence that would otherwise have been precluded by <u>Sandoval</u>, because "the jury was entitled to know the existence of evidence which refuted or cast doubt on [Petitioner's] testimony. <u>Rodriguez</u>, 85 N.Y.2d 591. After the modification, Respondent did not present testimony about how Petitioner used a gun in a prior crime or offer evidence that the crime was a robbery. Accordingly, the limited modification to the <u>Sandoval</u> ruling and the evidence admitted thereafter in no way violated Petitioner's due process rights.

"Federal habeas review of state court rulings is limited to determining whether the alleged error rose to the level of a Constituional violation. Generally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a Constitutional violation." <u>Simmons v. Ross</u>, 965 F. Supp. 473, 480 (S.D.N.Y. 1997). The Court finds no Constitutional violation here. Therefore, Petitioner is not entitled to habeas relief on this ground.

CONCLUSION

For the reasons stated above, the Court DENIES Petitioner's writ of habeas corpus in its entirety. A Certificate of Appealability is DENIED. The Clerk of the Court is directed to mark this matter as CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:  November  17 , 2009
        Central Islip, New York